# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAUL LUTE

     Plaintiff,

     v.

DOMINION NUCLEAR CONNECTICUT, INC.,

     Defendant.

No. 3:12-cv-01412 (MPS)

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Paul Lute ("Lute"), a former Plant Equipment Operator at a nuclear power station operated by Dominion Nuclear Connecticut, Inc. ("DNC"), has sued DNC for alleged harassment and for terminating his employment. (Compl. [Dkt. # 1].) Lute alleges that DNC discriminated against him in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12111 *et seq*. (the "ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. (the "Rehabilitation Act"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* (the "ADEA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq*. ("CFEPA"). Lute has also sued DNC for negligent failure to supervise, hire, train, and monitor employees and for intentional infliction of emotional distress. On March 12, 2013, the Court granted, in part, DNC's partial motion to dismiss, finding that Lute's claims concerning acts of discrimination that occurred on or before June 23, 2010, were time-barred and dismissing the negligence claim to the extent that it concerned any conduct other than Plaintiff's termination. The Court denied DNC's motion to dismiss the CFEPA claim. (*See* [Dkt. # 49].) DNC has moved for summary judgment on all

remaining claims [Dkt. # 82], and has moved to strike Lute's opposition brief [Dkt. # 100]. Plaintiff has moved, *nunc pro tunc*, for leave to file excess pages [Dkt. # 103]. The Court grants Lute's motion for leave to file excess pages and denies DNC's motion to strike. For the reasons that follow, the Court grants DNC's motion for summary judgment.

## I.   BACKGROUND

The following facts from the parties' statements of material fact pursuant to Local Rule 56(a) are undisputed, unless otherwise indicated. (*See* Def.'s Local Rule 56(a)(1) Statement [Dkt. # 83] ("Def.'s SMF"); Plaintiff's Local Rule 56(a)(2) Statement [Dkt. # 94-2] ("Pl.'s SMF").)[1]

### A.   Millstone Power Station and Nuclear Regulations

Millstone Power Station ("Millstone") is a nuclear power station in Waterford, Connecticut. (Def.'s SMF ¶ 2.) Lute began working as a Plant Equipment Operator at Millstone in 1988. (*Id.*) DNC began operating Millstone on March 31, 2001, and Lute became an employee of DNC at that time. (*Id.* ¶ 6.) As a Plant Equipment Operator, Lute was "responsible for starting, operating, inspecting, testing, monitoring, and shutting down various equipment and components of Millstone." (*Id.* ¶ 12.) To perform his duties, Lute worked in sensitive areas of Millstone without supervision, including areas involved in generating nuclear power. (*Id.* ¶ 13.) DNC required all Plant Equipment Operators, including Lute, to maintain "unescorted access authorization" ("UAA") to Millstone. (*Id.*)

The U.S. Nuclear Regulatory Commission ("NRC") licenses DNC to operate Millstone. (*Id.* ¶ 7.) "Pursuant to NRC requirements, DNC maintains a behavioral observation program

---

[1] Plaintiff's Local Rule 56(a)(2) Statement admits paragraphs 1-33, 35-51, 54-64, 66-67, 68-70, 72-74, 76-80, 82-91, 95-96, 100-101, 103-104, 106-109, and 111-118 of Defendant's Local Rule 56(a)(1) Statement.

("BOP") under which each person granted UAA at Millstone is observed by a supervisor trained to detect changes in behavior that could indicate degraded or impaired performance." (*Id*. ¶ 8.) Supervisors must report such changes in behavior to Patrick Anhalt ("Anhalt"), Supervisor of Fitness for Duty and Access Programs. (*Id*. ¶¶ 9-10.) Anhalt is responsible for evaluating DNC employees' suitability for UAA. (*Id*.) If Anhalt determines, based on DNC's behavioral observation reports, that an employee is no longer suitable for UAA, "he must withdraw or terminate the employee's UAA, and he must complete a reevaluation or investigation into that person's suitability for UAA." (*Id*. ¶ 11.)

### B.     Voluntary Separation Program

Lute was eligible to participate in DNC's January 2010 voluntary separation program ("VSP"), which offered certain eligible employees who volunteered to leave DNC a package of separation benefits. (*Id*. ¶¶ 15-16.) DNC prepared individual packages about the VSP benefits for eligible employees, and encouraged them to pick up their packages from the human resources department. (*Id*. ¶ 17.) Various DNC employees, managers, and supervisors encouraged Lute to pick up his package on at least five separate occasions. In response, Lute said that he was not interested, and he never picked up his package. (*Id*. ¶¶ 19-24.) After Lute told a human resources representative who had contacted him that he was not interested in the VSP, she asked him to send her an e-mail stating that he was not interested. After Lute sent this e-mail, no one from DNC management raised the issue of VSP with him again. (*Id*. ¶¶ 23-25.) DNC laid off employees in March 2010, but Lute was not laid off at that time. (*Id*. ¶ 25.)

### C.     Incident at Burke's Tavern

On Friday, April 9, 2010, Lute went to Burke's Tavern, drank several beers, and became intoxicated. (*Id*. ¶ 26.) Glen Bobowicz ("Bobowicz"), a Millstone supervisor "with whom Lute

3

had previously had some work-related conflicts," arrived at Burke's Tavern at some point that night. (*Id*. ¶ 27.) Lute walked by Bobowicz and heard him say something, although he was not sure exactly what Bobowicz said. (*Id*. ¶ 28.) "Lute followed Bobowicz out of the bar and confronted" him. Lute screamed at Bobowicz, leaned into his car, tried to grab him, and put his finger in Bobowicz's face. "In the process, Lute broke Bobowicz's car window." (*Id*. ¶ 29.) The police arrested Lute for breach of the peace. (*Id*. ¶ 30.) Lute informed Robert Riley ("Riley"), Supervisor of Nuclear Shift Operations, of the incident and his arrest on the following day. (*Id*. ¶ 31.)

On the Monday (April 12) following the incident, Lute met with Riley, Anhalt, and Ed Trengrove ("Trengrove") of human resources and provided "a written statement about the incident." (*Id*. ¶ 32.) In the statement, Lute "explained that, after Bobowicz mumbled something at him, Lute 'lost control of [himself]' and 'let [his] emotions do the thinking for [him].' Lute wrote that he held himself 'fully responsible' for his conduct" that night. (*Id*. ¶ 33.) Although Lute denies that Anhalt "concluded that the incident at Burke's raised a concern about Lute's suitability for" UAA, the evidence he cites in support of the denial—his own deposition testimony—does not speak to what Anhalt might have concluded. (*Id*. ¶ 34.) In any event, the parties do not dispute that Anhalt suspended Lute's UAA and required him to contact DNC's Employee Assistance Program ("EAP"). (*Id*. ¶¶ 35-36.) Lute then voluntarily enrolled in an intensive outpatient program for alcohol abuse, and used sick leave from DNC during his treatment. (*Id*. ¶¶ 37-38.) Lute claims that a doctor evaluated him on the first day of treatment and diagnosed him with anxiety and mild depression. (*Id*. ¶ 38.)

### D.   June 2010 – Lute's Return to Work

In order to return to work, Lute had to regain UAA. (*Id.* ¶ 39.) To do so, he had to undergo a background check, self-disclose his criminal history, and complete several questionnaires. (*Id.*) DNC restored Lute's UAA and cleared him to return to work on June 21, 2010. (*Id.* ¶¶ 40-41.) Among others, Trengrove, Riley, and manager Ken Grover ("Grover") convened a meeting with Lute to discuss possible disciplinary action for his behavior at Burke's Tavern. (*Id.* 42.) Trengrove began by asking "Lute to explain what had happened that night. Lute responded that they should read his April 12 written statement. He also expressed irritation about having to talk about the incident, having been questioned about it previously." (*Id.* ¶ 44.) Lute stated that Bobowicz was also at fault for the incident, and described his previous conflicts with Bobowicz. He complained that Bobowicz "was condescending and unprofessional." (*Id.* ¶ 45.)

On June 23, 2010, Randi Parrette ("Parrette"), Lute's supervisor, called Lute to a meeting with Riley and himself. Riley "told Lute that he was on a 'fact finding mission'" and again asked Lute to describe what happened at Burke's on April 9. (*Id.* ¶ 48.) "He also asked Lute if he had any other involvement with Bobowicz outside of work." (*Id.*) Lute responded that he had already discussed the incident and given a written statement about it. He "again complained about his past conflicts with Bobowicz." (*Id.* ¶ 49.) Lute said that the incident had a negative effect on his family and himself. Riley then asked how Lute's family was doing, and "Lute said that he was too upset to return to work and requested the rest of the day off." (*Id.* ¶ 50.) Lute left work and began having chest pain. He drove to a clinic, and ultimately spent the night in a hospital, having suffered from an apparent anxiety attack. (*Id.* ¶ 51.)

On June 28, 2010, Lute attended a meeting with Riley, Trengrove, Anhalt, Parrette, and another supervisor, Joseph Hochdorfer. (*Id.* ¶ 54.) Anhalt informed Lute that his UAA was suspended a second time "because, according to Riley's evaluation, he had displayed anger and

5

resentment toward Bobowicz, and DNC believed he still harbored bad feelings toward Bobowicz." (*Id.*) Lute followed Anhalt's instructions to contact EAP within twenty-four hours, and he scheduled a psychological evaluation. (*Id.* ¶¶ 54-55.) Lute complained, however, that Riley falsified the observation report, untruthfully stating that he had displayed anger and resentment, in order to subject him to a psychological examination. (Pl.'s SMF ¶¶ 54-55.) Forensic Psychologist Lisa Piechowski, Ph.D. ("Piechowski"), evaluated Lute and cleared him to return to work. (Def.'s SMF ¶ 56.) Lute told Piechowski that he had minor anxiety issues. (*Id.*)

### E.    August 2010 – Lute's Second Return to Work

Based on Piechowski's evaluation, DNC restored Lute's UAA and he returned to work. (*Id.* ¶ 57.) To have his UAA restored, Lute had to go through the same process as in June, including signing the same types of forms. (*Id.* ¶ 58; Lute Tr. p. 151.)

On August 2, 2010, Lute sent an email to several DNC employees, including Parrette, Riley, and Brenda Pearson in human resources, about "[o]pen items to be addressed regarding [his] return to work . . ." In the email, Lute asked, "What type of disciplinary action (termination to be considered) is to be taken in regards to Paul Lute being charged with creating a public disturbance after breaking a window in Glen [Bobowicz's] vehicle in April 2010?" (*Id.* ¶ 59; Lute Tr. Ex. 16 [Dkt. # 86-1] at 98.) Lute's e-mail also asked:

> Will Dominion assist Bob Riley with expenses incurred by Paul Lute for overnight stay in the hospital? Or will I, Paul Lute will [sic] be forced to hold Bob Riley personally liable for emotional distress and hospital expenses he has caused the family of Paul Lute and to Paul Lute himself due to harassing unwarranted unethical treatment from Bob Riley. Also being ordered to answer any question including personal questions asked of me (even though I answered these same questions in previous fact finding meetings) [sic] Bob Riley says this is an expectation of Dominion management, is this a true statement?

(Def.'s SMF ¶ 60.) The "harassing unwarranted unethical treatment" referred to Riley's questioning Lute during a June 2010 meeting about the incident at Burke's. (*Id.*)

In response to Lute's e-mail, Robert Dull ("Dull"), Senior Investigator from DNC's corporate security department, interviewed Lute on August 11, 2010. "Dull asked Lute if Jesse Lute (who had also worked at Millstone) was his son, whether he had other kids at home, whether his wife worked, and where she worked." (*Id.* ¶¶ 62-63.) Dull prepared a written summary of the interview and reviewed it over the phone with Lute on August 12, 2010. (*Id.* ¶ 64.) "That same day, Lute initialed each page of the statement and signed it, certifying that it was a true reflection of his August 11 interview with Dull," and Lute confirmed its truth in his deposition. (*Id.*)

During one morning meeting, after Lute returned to work, Grover stated that he wished certain employees would quit. (*Id.* ¶ 58.) Grover did not refer to Lute (*Id.*), but Lute interpreted the statement as referring to him. (Lute Tr. p. 198.)

### F.      September 2010

Lute sent a letter to the Connecticut Attorney General on September 10, 2010. (*Id.* ¶ 65.) The letter referenced Lute's complaints and concerns about safety issues at Millstone, his complaints about Bobowicz, Riley's badgering, and Dull's questioning about his family. (*Id.* ¶ 65.) In the letter, Lute also complained that "I brought up concerns about the second supervisor and his condescending attitude towards his subordinates[,] a violation of Dominion's own ethics principals [sic]. Since then I have been forced to provide two written statements on the matter or face termination." (Lute Tr. Ex. 20 [Dkt. # 86-1] at 108.) Lute also complained to the NRC and the U.S. Occupational Safety and Health Administration ("OSHA") about Millstone. (Def.'s SMF ¶ 66.) On September 16, 2010, Lute again e-mailed the same group of DNC employees that he had e-mailed on August 2, 2010. He complained that Dull had forced him to answer questions about his family, and that "he had notified 'the authorities' concerning the safety of his family."

Although his e-mail did not say which "authorities" he had contacted, he clarified in his deposition that he "was referring to his letter to the Attorney General." (*Id.* ¶ 67.)

DNC decided not to discipline Lute for the Burke's Tavern incident, or for his conduct during the June meetings. Instead, in a meeting on September 20, 2010, Grover gave Lute a "Non-Disciplinary Reminder of Expectations" (the "Reminder"). "The Reminder stated that DNC expects its employees to resolve issues with[out] resorting to violence; treat others in a courteous, respectful and professional manner both on- and off-site; cooperate fully in company investigations (even if the employee believes that the questions have previously been answered); and be open and receptive to coaching and constructive criticism." (*Id.* ¶ 69.)

According to DNC, Lute's response to the Reminder was to state that he would not participate in future investigations at Millstone and to reiterate his complaints about Dull's investigation. Lute complained that "Dull asked him questions about his family, told him that he had to sign a statement or be terminated, tried to intimidate Lute and said he wanted to come to Lute's house. Grover suggested that Lute discuss these issues with Dull's supervisor, but Lute refused to do so." (*Id.* ¶ 71.) Lute denies this, but states that during the September 20, 2010 meeting, he informed DNC that he would have legal counsel at future meetings, and told DNC employees that they were badgering and harassing him, and he would not let it continue. (Pl.'s SMF ¶ 71; Lute Tr. pp. 176-178.)

DNC contacted Dull's supervisor, Dan Jenkins ("Jenkins"), and informed him of Lute's concerns about Dull's interview. (Def.'s SMF ¶ 72.) Jenkins investigated Lute's concerns and concluded that they were meritless. (*Id.* ¶ 75.) Lute denies this and "[d]isputes the substance of the conclusions," although the portions of his deposition testimony to which he points do not speak to Jenkins's investigation or contradict the notion that Jenkins concluded that Lute's

concerns were meritless; they simply reiterate Lute's views about the Dull interview. (Pl.'s SMF ¶ 75.) Lute requested to meet with Grover and Parrette. (Def.'s SMF ¶ 73.)

> During the meeting, Lute said that he accepted responsibility for the April 9 incident with Bobowicz, but again raised complaints about Bobowicz and asked what was being done about them. At one point during the meeting, Lute took off his identification badge and threw it on the table. He raised his voice, saying that maybe he was "harboring more anger and resentment," and invited Grover to revoke his UAA. Lute also declared that he would no longer participate in any questioning unless it was plant-related.

(*Id.* ¶ 74.)

### G.    November 2010 – Third UAA Suspension

Lute received a phone call from Carol Horowitz ("Horowitz") of OSHA in response to his earlier complaints to OSHA. Horowitz and Lute scheduled a meeting, but Lute later left a voicemail with Horowitz in which he canceled the meeting. (*Id.* ¶ 77.) In the voicemail, he stated "[I] guess you can read about it in the newspaper when it happens, because the next time I go to the hospital, I'm going to take someone with me." He repeated the statement at the end of the message, stating, "So, like I said, next time I'm pushed in the hospital, I'm taking someone with me." (*Id.* ¶ 79.) Horowitz told DNC about the voicemail message—and sent DNC an electronic copy of it—on November 29, 2010. (*Id.* ¶ 80.) Anhalt listened to the message and interpreted it as a threat of violence against other Millstone employees, which called into question Lute's suitability for UAA. (*Id.* ¶ 81.) Lute denies that "[t]he voicemail message caused Anhalt to question whether Lute constituted a threat to the safe and secure operation of Millstone or a threat to commit radiological sabotage," although he cites no evidence to support this denial. (Pl.'s SMF ¶ 81; L.R. 56(a)(3) (requiring that each denial be followed by a citation of evidence).) Anhalt suspended Lute's UAA, pending an investigation. (Def.'s SMF ¶ 81.) When Lute arrived for work on November 30, 2010, DNC security took Lute's badge, and told him to leave

Millstone and call Grover. (*Id.* ¶ 82.) Lute eventually spoke to Michael Elliot ("Elliot") from corporate security. (*Id.* ¶ 84.) On December 2, 2010, Elliot interviewed Lute, and Lute told Elliot that he did not recall making threats in the voicemail message to Horowitz. After listening to the message, Lute said he understood how it could be perceived as a threat. (*Id.* ¶ 85.) Lute explained that he was under stress because he had been harassed by co-workers since August. (*Id.* ¶ 86.) He claimed that a co-worker, Tom Stern ("Stern"), had made jokes about the Burke's Tavern incident and talked about Lute's UAA suspension with other employees. He also claimed that another co-worker, Lloyd Morales ("Morales"), asked him "what's going on" and whether Lute needed to talk to someone. (*Id.* ¶ 87.) Lute was arrested on December 10, 2010, because of the threatening voicemail message (*Id.* ¶ 90), and, according to Lute, the charges were later dropped. (Lute Tr. p. 220.) DNC investigated Lute's allegations against Stern and Morales. (*Id.* ¶ 91.) DNC claims that based on its investigation, it could not substantiate Lute's claims that Stern and Morales harassed him. (*Id.* ¶¶ 92-94.) Lute denies this. (Pl.'s SMF ¶¶ 92-94.)

While his UAA was suspended, Lute was on paid leave. "Based on the concerns raised by Lute's voicemail message and Lute's behavior since his previous psychological evaluation, Anhalt determined that Lute should undergo another psychological evaluation to determine his fitness for unescorted access." (Def.'s SMF ¶ 95.) DNC claims that Anhalt attempted to call Lute several times to discuss another psychological evaluation with Piechowski, but Lute never responded to his voicemail messages. (Def.'s SMF ¶ 97.) Lute claims that he did not receive any calls from DNC and he was afraid of calling DNC himself. (Pl.'s SMF ¶ 97.) Anhalt wrote Lute a letter on January 25, 2011, to inform him that he had a psychological evaluation with Piechowski scheduled for January 28. (Def.'s SMF ¶ 97.) Lute received the letter some time on or after January 28, after the scheduled evaluation. (Def.'s SMF ¶ 99.) DNC claims that, after

Lute missed the appointment with Piechowski, Anhalt tried to contact Lute by phone but Lute did not answer or respond to his voicemail message. (Def.'s SMF ¶ 99.) Lute denies that he received any calls from DNC, and testified that he was fearful to call DNC himself. (Pl.'s SMF ¶ 99; Lute Tr. pp. 227, 230.)

DNC claims that Anhalt sent Lute another letter on February 10, 2011, stating that the UAA suspension remained in place, and despite attempts to contact Lute, Lute had not responded. The letter stated that Lute could appeal the decision to deny his UAA within 10 days. (Def.'s SMF ¶¶ 100-101.) Lute received the letter, and did not respond to it, saying that he was afraid to do so. (Lute Tr. pp. 228-30.) DNC terminated Lute's employment (effective February 17, 2011) by letter dated February 18, 2011. (Def.'s SMF ¶ 102; Lute Tr. Ex. 29 [Dkt. # 86-1] 120.) Lute hired a lawyer, who wrote Anhalt a letter, dated February 23, 2011, notifying Anhalt that Lute intended to appeal the UAA denial and requesting more time to submit documents in support of the appeal. (*Id.* ¶ 103; Lute Tr. Ex. 30 [Dkt. # 86-1] at 121.) The lawyer never submitted any additional material on Lute's behalf, and DNC never received any additional information or materials about Lute's appeal. (Def.'s SMF ¶¶ 104, 107.) An independent panel made up of management reviewed Lute's appeal and affirmed the denial of his UAA. DNC notified Lute of that final decision by letter dated May 16, 2011. (*Id.* ¶¶ 108-109.)

### H.    Administrative History

Lute wrote a letter to the Equal Employment Opportunity Commission ("EEOC") on January 21, 2011, requesting to file a complaint against DNC. (*Id.* ¶ 113.) Among other things in the letter, Lute claimed that Millstone management had "threatened, badgered and isolated [him] in an attempt to get [him] to quit." (*Id.*) Lute attached a completed EEOC Intake Questionnaire to the letter, alleging that DNC retaliated against him and discriminated against him on the basis of

age and disability. (*Id.* ¶ 114.) On February 24, 2011, Lute filed a charge of discrimination with

the EEOC and the Connecticut Commission on Human Rights & Opportunities ("CHRO"),

alleging age and disability discrimination and retaliation by DNC on or before June 23, 2010

("First Charge"). (*Id.* ¶ 115.) Lute requested a "right to sue" on the First Charge from the EEOC

on July 8, 2011, and the EEOC issued him a Right to Sue letter on July 15, 2011. (*Id.* ¶ 116.)

Lute filed a second charge with the CHRO ("Second Charge") on August 16, 2011, alleging age

and disability discrimination and retaliation between November 17, 2010, and February 17,

2011. (*Id.* ¶¶ 117-18.) The Second Charge specifically alleged violations of the CFEPA, while

the First Charge did not. (Lute Tr. Ex. 34-35 [Dkt. # 86-1].) Lute filed this lawsuit on October 2,

2012. (Compl. [Dkt. # 1].)

## II.   **<u>STANDARD</u>**

Summary judgment is appropriate only when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as

to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute

regarding a material fact is genuine if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116

(2d Cir. 2006) (internal quotation marks and citation omitted). "The court must resolve all

ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a

reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.

1992). If the moving party carries its burden, "the opposing party must come forward with

specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli*

*Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

In employment discrimination cases, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir.2006) (citation omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate test "is whether the evidence can reasonably support a verdict in Plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

## III.   DISCUSSION

### A.   ADEA Claims

DNC argues that Lute's age discrimination claims are untimely and should be dismissed. (Def.'s Mem. Summ. J. [Dkt. # 82] at 11.) This Court previously ruled that Lute's allegations of discrimination that occurred on or before June 23, 2010, were time-barred because Lute failed to bring a lawsuit on such claims within ninety days of receiving a Notice of Right to Sue letter from the EEOC.[2] (*See* Order [Dkt. # 49].) When asked to give the dates of all incidents that constituted age discrimination against him in violation of the ADEA and/or the CFEPA, Lute described 1) being approached by DNC employees to consider early retirement as part of the VSP in January 2010[3] and 2) DNC's layoffs in March 2010. (*See* Pl.'s Resp. to Def.'s First Set

---

[2] The CFEPA also requires that complaints alleging discrimination "shall be brought within ninety days of the receipt of the release from the [CHRO]." Conn. Gen. Stat. § 46a-101(e). It is not clear from the record when Lute received a Release of Jurisdiction from the CHRO, although his complaint alleges that he received it (Compl. ¶ 40), and DNC does not argue that Lute's CFEPA age discrimination claims are also time-barred for this reason.

[3] Lute also raises allegations about the VSP as part of his retaliation claim, but his refusal to participate in the VSP is not protected activity for purposes of retaliation under the ADEA. Voluntary separation programs are lawful under the ADEA. "The ADEA creates a safe harbor for an employer's early

of Interrogatories, Feudo Aff. Ex. H [Dkt. # 86-8] at 35-36.) These two alleged incidents, which

occurred before June 23, 2010, are untimely, and the Court grants DNC summary judgment on

Lute's ADEA claims.[4]

### B.   ADA and Rehabilitation[5] Act Disparate Treatment Claims

Disability discrimination claims follow the familiar burden shifting framework

established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). "A plaintiff must

establish a prima facie case; the employer must offer through the introduction of admissible

evidence a legitimate non-discriminatory reason for [its adverse employment action]; and the

plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason

---

retirement programs." *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997) (citing 29 U.S.C. § 623(f)(2)(B)(ii) ("[i]t shall not be unlawful for an employer . . . to take any action otherwise prohibited under [the ADEA] to observe the terms of a bona fide employee benefit plan that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this chapter.")). "The declination of a buyout is not protected activity under the law and cannot serve as the basis of a retaliation claim." *Ruhling v. Tribune Co.*, No. CV 04-2430 (ARL), 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007). Because "[t]he Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA" *Farrar v. Town Of Stratford*, 537 F. Supp. 2d 332, 348 (D. Conn. 2008), it is likely that refusal to participate in the VSP is not protected activity for purposes of the CFEPA.

[4] Lute did not address DNC's argument that his age discrimination claims are time-barred in his opposition brief. He states only, "[i]n the instant case, the defendant pursued the plaintiff doggedly to get him to accept a Voluntary Separation Agreement. The defendant and its agents bagered [sic] and harassed the plaintiff to review and accept this retirement." (Pl.'s Opp. Br. [Dkt. # 94-1] at 43.)

[5] The Rehabilitation Act prohibits discrimination against the disabled by recipients of federal funds. Lute "has neither alleged any facts, nor come forward with any evidence, that [DNC] received federal financial assistance." *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 251 (D. Conn. 2013). Lute simply states that "[i]t is undisputed that, as a recipient of federal funds, the Rehabilitation Act applies to the defendant." (Pl.'s Opp. Br. [Dkt. # 94-1] at 12.) Because Lute has failed to provide sufficient evidence that DNC is a recipient of federal financial assistance, he is unable to establish a prima facie case of discrimination under the Rehabilitation Act and the Court grants summary judgment to DNC on his Rehabilitation Act claims. *See Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003). In any event, "[c]ourts generally apply the same legal standards when adjudicating claims arising under the ADA and ones arising under the Rehabilitation Act." *Bryant v. Steele*, No. 13-CV-5234 ADS GRB, 2014 WL 2475608 (E.D.N.Y. June 3, 2014) (*citing Harris v. Mills,* 572 F.3d 66, 73 (2d Cir.2009)).

is a pretext." *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (internal citations and quotation marks omitted).

### 1.      Lute's Challenge to his Termination Fails because he was not "Otherwise Qualified"

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (internal citations and quotation marks omitted). The parties do not dispute that DNC is subject to the ADA or that termination is an adverse employment action. They dispute whether Lute "was otherwise qualified to perform the essential functions of his job" at the time he was terminated. Because the Court concludes that no reasonable juror could find that he was, the Court does not address the other disputed issues with respect to termination.[6]

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8). The ADA provides that, "consideration shall be given to the employer's judgment as to what functions of a job are essential. . . ." 42 U.S.C. § 12111(8).

The Court finds that having UAA was essential to Lute's job as a Plant Equipment Operator in a nuclear power facility, and without it, he was not "otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation." As shown below, because he did not have UAA when he was terminated and had manifested no intention to

---

[6] DNC also disputes whether Lute was disabled within the meaning of the ADA and whether the circumstances raise an inference of discrimination.

reinstate it, he has failed to raise a genuine issue of material fact as to whether he was "otherwise qualified," which is an element of his prima facie case of discrimination. To understand why the Court reached this conclusion, it is helpful to begin with some regulatory background.

It is undisputed that, as a Plant Equipment Operator, Lute worked in sensitive areas of Millstone without supervision, including areas involved in generating nuclear power. (Def.'s SMF ¶ 13.) DNC required all Plant Equipment Operators, including Lute, to maintain UAA for Millstone. (*Id.* ¶ 13.) Lute does not dispute that before he could return to work in June 2010, he had to regain UAA. (*Id.* ¶ 39.)

NRC licenses DNC to operate Millstone. (*Id.* ¶ 7.) "Only a licensee shall grant an individual unescorted access. Licensees . . . shall certify individuals' unescorted access authorization and are responsible to maintain, deny, terminate, or withdraw unescorted access authorization." 10 C.F.R. § 73.56(a)(4). NRC regulations require licensees to establish and maintain an "access authorization program" *Id.* § 73.56(a)(2), which "must provide high assurance that the individuals who" are granted unescorted access to sensitive areas of nuclear power plants "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." *Id.* § 73.56(b)-(c).

Before UAA is granted, employees must complete a psychological evaluation "to assist in determining an individual's trustworthiness and reliability." *Id.* § 73.56(e). Federal regulations require that licensees' UAA programs "include a behavioral observation program that is designed to detect behaviors or activities that may constitute an unreasonable risk to the health and safety of the public and common defense and security, including a potential threat to commit radiological sabotage." *Id.* § 73.56(f)(1). "Each person subject to the behavior observation

program shall be responsible for communicating to the licensee . . . observed behaviors of [other] individuals subject to" UAA requirements, including "any behavior . . . that may adversely affect the safety or security of the licensee's facility or that may constitute an unreasonable risk to the public health and safety or the common defense and security, including a potential threat to commit radiological sabotage." *Id.* § 73.56(f)(2). Individuals are expected to "report any concerns arising from behavioral observation, including, but not limited to, concerns related to any questionable behavior patterns or activities of others to the reviewing official . . . ." who "shall reassess the reported individual's [UAA] status," and "determine the elements of the reassessment based on the accumulated information of the individual." *Id.* § 73.56(f)(3). The regulations contemplate that such reassessments may include further psychological evaluations. *Id.* § 73.56(e)(6) ("During psychological reassessments" psychologist performing reassessment must inform reviewing official of medical conditions that could adversely impact employee's fitness for duty). "If the reviewing official has a reason to believe that the reported individual's trustworthiness or reliability is questionable, the reviewing official shall either administratively withdraw or terminate the individual's [UAA] while completing the re-evaluation or investigation." *Id.* § 73.56(f)(3). Federal regulations also require that licensees implement "Fitness-for-duty" ("FFD") programs for individuals who are granted UAA to nuclear power reactor protected areas. *Id.* § 26.4(a)-(b). Among other things, FFD programs must "[p]rovide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties" and "[p]rovide reasonable measures for the early detection of individuals who are not fit to perform the duties that require them to be subject to the FFD program." *Id.* § 26.23(b)-(c).

17

The parties agree that DNC maintains a BOP "under which each person granted UAA at Millstone is observed by a supervisor trained to detect changes in behavior that could indicate degraded or impaired performance." (Def.'s SMF ¶ 8.) Supervisors must report such changes in behavior to Anhalt, who is responsible for evaluating employees' suitability for UAA as Supervisor of Fitness for Duty and Access Programs. (*Id*. ¶¶ 9-10.) If Anhalt determines, based on DNC's behavioral observation reports, that an employee is no longer suitable for UAA, "he must withdraw or terminate the employee's UAA, and he must complete a reevaluation or investigation into that person's suitability for UAA." (*Id*. ¶ 11.)

The undisputed facts show that Lute needed UAA to do his job and that at the time he was terminated he neither had UAA nor had manifested any intention to obtain it, despite being informed of the need to do so and of his right to appeal the decision taking it away. Construing the entire record in Lute's favor—assuming, for example, that Riley falsified the BOP and lied about Lute being angry and resentful in June 2010 in order to suspend his UAA the second time—the undisputed fact remains that in November 2010 Lute made statements on the voicemail message that even he concedes could be perceived as threats. (*Id*. ¶ 85.) In light of this, and the regulatory framework governing DNC's administration of the UAA program, no reasonable juror could find that DNC behaved improperly in suspending his UAA on the third occasion. That left him without a UAA—a critical qualification for the job, which even he acknowledges. (Lute Tr. p. 111 ("Q. Did you understand that unescorted access was a prerequisite of your job at Dominion? A. Well, we take it – it's part of the job.").) Regardless of the events that led him to that situation—even if, for example, the harassment of his co-workers drove him to leave the voicemail message—Lute had to re-obtain UAA before he could be

considered qualified for the job, and no reasonable juror could find that he took the steps

necessary to do that.

Lute argues that a "genuine dispute of material facts exists as to whether a subsequent

psychiatric evaluation, in light [of] a very recently past previous psychological evaluation, is a

bona fide occupational requirement."[7] (Pl.'s Opp. Br. [Dkt. # 94-1] at 16.) Lute argues that "such

a requirement was pretextual and discriminatory, and merely placed upon the suffering plaintiff

for the purpose of impelling him to quit, or to fail to perform an unnecessary obligation, thereby

permitting the defendant to terminate the plaintiff, and to have a pretextual reason to offer the

court." (*Id.*) But the record does not support this argument. Lute has submitted no evidence that

other DNC employers who have lost UAA under similar circumstances were not required to

submit to psychological evaluations before regaining it. *See McDonnell Douglas,* 411 U.S. at

804; *Zeinali v. Raytheon Co.*, 636 F.3d 544, 554 (9th Cir. 2011). Moreover, during his deposition

Lute admitted that psychological evaluations, along with background checks, credit checks, and

the like were "part of the unescorted access" process, were conducted by "every other nuclear

plant in the country with unescorted access," and were "required by law." (Lute Tr. pp. 62-64.)

Before one can obtain UAA in the first instance, a psychological examination is required, 10

C.F.R. § 73.56(e), and the regulations governing DNC contemplate that the reviewing official

may make psychological evaluations part of a reassessment. 10 C.F.R. § 73.56(f)(3) ("reviewing

official shall determine the elements of the reassessment"); *id.* § 73.56(e)(6) (discussing

---

[7] An employer's imposition of a facially discriminatory job requirement may constitute a bona fide occupational qualification ("BFOQ"), which is an affirmative defense to discrimination under some anti-discrimination statutes. *See, e.g.,* 29 U.S.C.A. § 623(f)(1) (BFOQ defense under ADEA). There is no facially discriminatory job requirement at issue here, and the ADA does not provide for this defense in any event. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 982 (9th Cir. 2007) ("the plain language of the ADA does not support" imposition of BFOQ standard).

psychological reassessment). Further, Lute admitted that every few years, he had to have another psychiatric evaluation, and such evaluations were "just part of the job." (*Id.* p. 149.) He did not oppose or complain to his superiors about having to submit to either the first or second psychological evaluation. Finally, until filing his response to summary judgment, he never suggested that he was prepared to take other steps—short of a psychological evaluation—to regain his UAA after it was suspended the third time. To the contrary, he did not respond to multiple notices concerning the third suspension of his UAA, and failed to pursue an appeal.

Nor has he identified a reasonable accommodation, such as an action that would have allowed him to regain UAA without submitting to another psychological evaluation. *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995). ("[T]he plaintiff bears the burden of proving that she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified."); *Clifford v. Cnty. of Rockland*, 528 F. App'x 6, 8 (2d Cir. 2013) ("A plaintiff alleging that he was denied a reasonable accommodation bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to meet the essential eligibility requirements of the service, program, or activity at issue.") (internal citations omitted). Indeed, Lute does not even claim that his employer failed to offer a reasonable accommodation.

The ADA requires courts to give some consideration to the "employer's judgment as to what functions of a job are essential. . . ." 42 U.S.C. § 12111(8).[8] Courts must also give

---

[8] The sensitive nature of the nuclear power industry and the extensive regulation of that industry by the NRC both suggest that the consideration given to the employer's determinations in this area should be especially deferential. After the Supreme Court's ruling in *Dep't of Navy v. Egan*, 484 U.S. 518, 522 (1988)—which held that the Merit Systems Protection Board did not have the authority to review the Navy's decision to revoke an employee's security clearance—courts have been reluctant to review

"substantial deference to an employer's determination of what qualifications are essential" to perform those functions. *Johnson v. New York Hosp.*, 189 F.3d 461 (2d Cir. 1999) ("This is particularly true where, as here, the job in question implicates issues of public safety."). Once Anhalt received the report of the threat, he was required to "reassess the reported individual's [UAA] status," and to "*determine the elements of the reassessment based on the accumulated information of the individual.*" *Id.* § 73.56(f)(3) (emphasis added). Thus, Anhalt was obligated to suspend Lute's UAA pending reevaluation, and could "determine the elements of reassessment" based on the circumstances of Lute's situation, which included two recent suspensions, a twice voiced security threat, and a recent hospitalization for an anxiety attack. Six months had also elapsed from his last psychological exam—during which he voiced the threats. No reasonable juror could find that Anhalt's decision to include a psychological evaluation as an "element of reassessment" was pretextual or discriminatory.

The Court concludes that Lute's failure to maintain UAA means that he cannot show that he was "otherwise qualified to perform the essential functions of his job," and thus cannot establish a prima facie case of discrimination under the ADA. Several district courts have reached similar conclusions. *See McCoy v. Pennsylvania Power & Light Co.*, 933 F. Supp. 438, 442 (M.D. Pa. 1996) (dismissing plaintiff's ADA complaint and agreeing that NRC regulations required defendant nuclear power plant to suspend plaintiff's UAA after it received notice of his alcoholism "and other psychological difficulties"); *Mathieson v. Am. Elec. Power,* No. 1:00cv870, 2002 U.S. Dist. LEXIS 6560 (W.D. Mich. Jan. 14, 2002) (*recommended ruling approved and adopted* by *Mathieson v. Am. Elec. Power*, 2002 U.S. Dist. LEXIS 3051 (W.D.

---

employers' decisions to suspend UAA. *See, e.g., Coppett v. Tennessee Valley Auth.*, 987 F. Supp. 2d 1264 (N.D. Ala. 2013) (finding that the court did not have authority to review the suspension of UAA for a nuclear power plant employee who alleged that his suspension was unlawfully motivated).

Mich. Feb. 20, 2002)) (finding that satisfying NRC FFD program is an essential function of plaintiff's job and granting summary judgment to defendants on plaintiff's ADA termination claim when doctor failed to clear him for UAA); *Sysko v. PPL Corp.*, No. 3:CV-07-0470, 2009 WL 4725240 (M.D. Pa. Dec. 2, 2009) (granting summary judgment to defendant nuclear power facility after finding that without UAA, plaintiff was not "otherwise qualified to perform the essential functions" of his job and thus was not "qualified individual" under the ADA).

### 2.   Suspensions of UAA: No Adverse Employment Action

It is not clear whether Lute is challenging his second and third UAA suspensions, which occurred on June 28, 2010, and November 30, 2010, respectively, as discrete adverse employment actions.[9] In any event, however, there is no evidence that these suspensions were "adverse employment actions," sufficient to establish a prima facie discrimination claim because there is no evidence that the suspensions were unpaid. (Def.'s SMF ¶¶ 56, 95.) There is no dispute that, after his UAA was suspended on November 30, 2010, "Lute remained out of work on paid leave." (*Id.* ¶ 95.) And Lute fails to point to any evidence in the record that his June 2010 suspension was unpaid. The Second Circuit has held that "a suspension with pay pending an investigation does not, *without more,* constitute an adverse employment action." *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (internal quotation marks and citations omitted). "Paid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies." *Id.* As set forth above, Lute does not provide any evidence that he suffered "actions beyond" DNC's normal disciplinary policies.

### C.   Retaliation Claims

---

[9] The Complaint appears to challenge only the third suspension. (Compl. ¶¶ 31-32.)

Lute claims that DNC suspended his UAA on November 30, 2010, and ultimately terminated him on February 17, 2011, in retaliation for his complaints to the EEOC in a letter dated January 21, 2011, about DNC's discrimination, harassment, and retaliation.[10] (Compl. [Dkt. # 1] ¶¶ 36-39.)

The ADA makes it "unlawful for an employer to 'discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (*quoting* 42 U.S.C. § 12203(a)). Retaliation claims under the ADA and the Rehabilitation Act are governed by the burden-shifting framework of Title VII cases. *Id.* Lute has the burden of establishing a prima facie case of retaliation. He must show that: (1) he engaged in protected activity; (2) DNC took adverse employment action against him; and (3) there is a causal connection between the alleged adverse action and the protected activity. *Treglia*, 313 F.3d at 719. Then, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational juror conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.* at 721 (internal citations and quotation marks omitted). In addition, "a plaintiff must show that, 'but-for' the protected activity, he or she would not have suffered the adverse employment action." *Housel v. Rochester Inst. of Tech.*, No. 10-CV-6222FPG, 2014 WL 1056576 (W.D.N.Y. Mar. 17, 2014) (*citing Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)); *c.f. Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 n.3 (2d Cir. 2014) (not

---

[10] Lute also alleges that DNC suspended his UAA and terminated him because he refused to participate in the VSP in January 2010, but this claim is time-barred. *See* III.A. *supra.*

deciding whether "but-for" standard also applies to plaintiff's ADA retaliation claim "because plaintiff fails to satisfy the more lenient "motivating factor" standard.")

### 1.      Prima Facie Case

Lute must show a causal connection between the alleged adverse action and the protected activity as part of his prima facie case of retaliation. Lute may show causation "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). As DNC points out, Lute has not shown any evidence of retaliatory animus directed against him, "nor has he shown other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Id.* Thus, he must establish causation by temporal proximity. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (noting that but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity). Such temporal proximity "must be 'very close,' which ordinarily means closer in time than a few months." *Cortez v. Connecticut, Dep't of Transp.*, 606 F. Supp. 2d 246, 251 (D. Conn. 2009) (*quoting Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Lute claims that DNC terminated him on February 17, 2011 in retaliation for his complaints to the EEOC about DNC's discrimination, harassment, and retaliation by letter dated January 21, 2011. (Compl. [Dkt. # 1] ¶¶ 36-39.) This temporal proximity—less than one month between the letter and Lute's termination—supports an inference of retaliation. Lute has made out a prima facie case of retaliation.

## 2.    Pretext and But-For Causation

"If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's 'protected activity was a but-for cause of the alleged adverse action by the employer.'" *Sanderson v. New York State Elec. & Gas Corp.*, 560 F. App'x 88, 93-94 (2d Cir. 2014) (summary order) (*quoting Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). Because DNC has articulated a legitimate, non-retaliatory reason for Lute's termination— namely, his failure to comply with the process of reinstating UAA—Lute must show evidence sufficient to permit a reasonable fact-finder to conclude that DNC's explanation is pretextual. "While temporal proximity alone may be sufficient to satisfy a retaliation plaintiff's prima facie burden . . . 'temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.'" *Sanderson*, 560 F. App'x at 94 (summary order) (*quoting El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir.2010)); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 255 (2d Cir. 2014) (affirming portion of district court's grant of summary judgment to defendant on Title VII retaliation claim where plaintiff "alleged nothing beyond temporal proximity to establish pretext"). Beyond temporal proximity, Lute offers no evidence that DNC's reason is pretextual. There is no evidence in the record of any communications among supervisors or others involved in his termination suggesting retaliatory intent or, for that matter, awareness of his EEOC complaint.

Moreover, Lute does not raise a triable issue of fact that his protected activity was a but-for cause of his termination. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From

such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846. There is no dispute that DNC suspended Lute's UAA on November 30, 2010 after he left a voicemail message that OSHA and DNC perceived as threatening (and that Lute agreed could be so perceived), that UAA was a requirement for his job, and that Lute did not cooperate with DNC in the process for reinstating UAA or appealing the denial in January and February of 2011. Even if DNC was motivated to terminate Lute in part by retaliatory animus, the evidence in the record shows that DNC would have terminated him, anyway, even if he had not filed the EEOC charge, because he did not have UAA and had manifested no intention to try to re-obtain it. Thus, the Court grants DNC summary judgment on Lute's retaliation claims.

### D.  Hostile Work Environment[11]

"[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (internal citations and quotation marks omitted).[12] "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an

---

[11] Although the claims, as pled, also refer to age-based harassment, Lute has cited no evidence of any age-based conduct by DNC occurring after June 23, 2010. Thus, any age-based hostile work environment claim is dismissed.

[12] The Second Circuit has not explicitly ruled that a hostile work environment claim is actionable under the ADA. *See Giambattista v. Am. Airlines, Inc.*, 584 F. App'x 23, 26 (2d Cir. 2014) ("this court has not yet decided whether a hostile work environment claim is actionable under the ADA"). Even so, district courts in this circuit have applied the Title VII hostile work environment standards to such claims under the ADA. *See Genco v. Starpoint Cent. Sch. Dist.*, No. 13-CV-301S, 2015 WL 540217, at *7 (W.D.N.Y. Feb. 10, 2015).

objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (*quoting Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). Lute must also show that "the conduct occurred because of [the protected characteristic]." *Alfano,* 294 F.3d at 374. Finally, the "plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004); *Gregory v. Daly*, 243 F.3d 687, 702 n.3 (2d Cir. 2001) ("For liability to attach, the employer must also be responsible for the conduct at issue."). Lute fails to show both that 1) DNC's conduct was sufficiently severe or pervasive to alter the conditions of his employment, and 2) the conduct occurred because of his disability. Therefore, his hostile work environment claim fails.

"Whether the challenged conduct is sufficiently severe or pervasive depends on the totality of the circumstances." *Aulicino*, 580 F.3d at 82 (internal citations and quotation marks omitted). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal citations and quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374. "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Id.*

### 1.    Pertinent Evidence

Lute contends that DNC harassed him because of his disability "between [his] first reinstatement and final revocation of [his] UAA." (Pl.'s Opp. Br. [Dkt. # 94-1] at 15.) He relies on the following conduct:

- DNC required Lute to attend several meetings in June 2010 where DNC employees questioned him regarding the incident at Burke's Tavern with Bobowicz. (Def.'s SMF ¶¶ 42, 48-50);

- Grover allegedly stated in a meeting in August 2010, without referencing Lute, that he wished certain employees would quit. (*Id.* ¶ 58);

- Riley allegedly falsified an observation report in June 2010 that said that Lute showed anger and resentment in order to suspend Lute's UAA and subject him to a psychological examination. (Pl.'s SMF ¶¶ 52-55);

- Dull interviewed Lute in August 2010, and asked him "if Jesse Lute (who had also worked at Millstone) was his son, whether he had other kids at home, whether his wife worked, and where she worked." (Def.'s SMF ¶¶ 62-63);

- Grover issued Lute a Non-Disciplinary Reminder of Expectations on September 20, 2010. (*Id.* ¶ 69);

- DNC revoked Lute's UAA on November 30, 2010 after he left the threatening voicemail message with OSHA. (*Id.* ¶ 81); and

- Lute's co-workers, Stern and Morales, allegedly harassed him beginning in August 2010. Stern had made jokes about the Burke's Tavern incident and had talked about Lute's UAA suspension with other employees, and Morales had asked him "what's going on" and whether Lute needed to talk to someone. (*Id.* ¶ 87).

Even if Lute subjectively perceived this conduct to be severe or pervasive, it was not objectively severe or pervasive enough to amount to a hostile work environment. Of these incidents, the most severe is Riley's alleged falsification of an observation report in June 2010, describing Lute as angry and resentful, but even this is not objectively severe enough on its own and it is an isolated incident.

There is insufficient evidence that Lute's workplace was "permeated" with discriminatory conduct. *See Terry*, 336 F.3d at 149 (a reasonable fact-finder could find conduct

sufficiently pervasive where plaintiff's co-workers and "supervisors purposefully harassed [plaintiff] and made his work environment unusually and unnecessarily unpleasant on a nearly daily basis"). DNC's alleged conduct consisted of seven incidents in six months.  The revocation of Lute's UAA on November 30, 2010, was, as shown, not improper at all. It is not clear that Grover's comment that he wished some employees would quit was directed at Lute, and even if it was, it is merely offensive. *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001) ("'conduct that is merely offensive' will not rise to the level of a hostile work environment.") Alleged jokes and questions from co-workers Stern and Morales amount to nothing more than offhand comments and isolated incidents. *See Nyack v. S. Conn. State Univ.*, 424 F. Supp. 2d 370, 377 (D. Conn. 2006) ("Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment."). Thus, Lute has failed to produce sufficient evidence to raise a triable issue of fact that his workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment.

## 2.    Inference of Discrimination

Lute has not alleged facts sufficient to allow a reasonable juror to conclude that DNC's conduct was based on Lute's disability or in retaliation for his complaints. Lute's bare allegation that he was harassed because of his disability is insufficient. He cites no evidence of remarks evidencing animus towards people with disabilities, and he does not identify similarly situated individuals who were treated differently than he was. In the case of Stern's comments, they do not necessarily indicate bias on the basis of disability. Further, Joseph Costa, a human resources generalist, interviewed Stern, and he "denied telling anyone why Lute's access to Millstone had been suspended, as he did not even know the reason himself." (Costa Aff. [Dkt. # 85] at 2.)

Under the circumstances, a reasonable fact-finder could not find that DNC's conduct, viewed separately or in combination, supports a reasonable inference of discrimination. Thus, the Court grants summary judgment to DNC as to Lute's hostile work environment claims.

### E.  Connecticut Fair Employment Practices Act ("CFEPA") Claims

CFEPA complaints "must be filed within one hundred and eighty days after the alleged act of discrimination." Conn. Gen. Stat. § 46a-82(f). Lute filed his Second Charge raising a claim for violation of CFEPA (he did not raise such a claim in the First Charge) on August 16, 2011.[13] *See O'Hazo v. Bristol-Burlington Health Dist.*, 599 F. Supp. 2d 242, 251-52 (D. Conn. 2009) (applying a 300-day limitation period to plaintiff's federal claims and a 180-day limitation period to plaintiff's CFEPA claims). Therefore, Lute can recover under the CFEPA only for acts of discrimination that occurred 180 days prior to August 16, 2011, which includes any date on or after February 17, 2011, which was the date of his termination. Any acts that occurred before his termination on February 17, 2011, cannot be used to support Lute's discrimination or retaliation claims. Moreover, the continuing violation doctrine does not save Lute's CFEPA hostile work environment claims because he "proffered no evidence to show that the termination, even if discriminatory, was in furtherance of the alleged practice of [discriminatory] harassment." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004); *see Aka v. Jacob K. Javits Convention Ctr. of New York*, No. 09 CIV. 8195 FM, 2011 WL 4549610, at *13 (S.D.N.Y. Sept. 30, 2011) (finding that plaintiff "cannot avail himself of the continuing violation exception" when "he has failed to show that his termination and any other alleged discriminatory acts were

---

[13] Even if his First Charge, filed on February 24, 2011, had stated CFEPA claims, it would only cover alleged acts of discrimination that occurred up to 180 days before, or acts on or after August 27, 2010. The only evidence of age discrimination that Lute cites is that various DNC employees, managers, and supervisors encouraged Lute to pick up his VSP package on at least five separate occasions. (Def.'s SMF ¶¶ 19-24.) After Lute sent an e-mail to a human resources representative stating that he was not interested in the VSP, no one from DNC management raised the issue of the VSP with him again. (*Id.* ¶¶ 23-25.) DNC laid off employees in March 2010, but Lute was not laid off at that time. (*Id.* ¶ 25.) Lute alleges no incidents of age discrimination after March 2010.

part of a specific discriminatory policy, mechanism, or program.") Lute has failed to set forth specific evidence that his termination resulted from a discriminatory policy or mechanism related to age or disability.

Finally, for the same reasons that the Court grants summary judgment to DNC on Lute's federal disability discrimination claims—failure to show that he is "otherwise qualified"—the Court also grants DNC summary judgment on Lute's CFEPA claims for discriminatory termination due to disability. "The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." *Farrar v. Town Of Stratford*, 537 F. Supp. 2d 332, 348 (D. Conn. 2008); *see Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349, 355 (1996) ("Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own anti-discrimination statutes.").

### F.    Intentional Infliction of Emotional Distress

Lute argues that, "the conduct of the defendant articulated in the plaintiff's complaint clearly constitutes extreme and outrageous behavior within the meaning of the law of intentional infliction of emotional distress." (Pl.'s Opp. Br. [Dkt. # 94-1] at 48-49.) To prevail on a claim of intentional infliction of emotional distress under Connecticut law, Lute must show (1) that DNC intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that DNC's conduct caused his distress; and (4) that Lute sustained severe emotional distress. *See Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 1062 (2000).

"Connecticut courts have narrowly defined the boundaries of extreme and outrageous conduct." *Sacco v. Paradigm New Haven Health Care, LLC*, No. 3:12CV1207 WWE, 2013 WL

2321709, at *2 (D. Conn. May 28, 2013). "Whether a defendant's conduct is sufficient to satisfy

the requirement that it be extreme and outrageous is initially a question for the court to

determine. Only where reasonable minds disagree does it become an issue for the jury." *Id.*

(internal citations omitted). A defendant is liable for intentional infliction of emotional distress:

> only where the conduct has been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community. Generally, the case is
> one in which recitation of the facts to an average member of the community
> would arouse his resentment against the actor, and lead him to exclaim,
> Outrageous!

*Id.* at 210-11(internal quotation omitted). "Conduct on the part of the defendant that is merely

insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an

action based upon intentional infliction of emotional distress." *Carrol v. Allstate Ins. Co.*, 262

Conn. 433, 443 (2003) (internal quotations and citations omitted). Reading the record in the light

most favorable to Lute, DNC's conduct, even if distressing to Lute, was less extreme than the

conduct Connecticut courts have found to be insufficient to support a claim for intentional

infliction of emotional distress in the employment context. *See, e.g., Appleton,* 254 Conn. at 211

(supervisor's conduct toward plaintiff, including making condescending comments, questioning

her ability to read, telephoning the police who escorted plaintiff out of the building, subjecting

plaintiff to two psychological examinations, and forcing plaintiff to take a suspension and a leave

of absence, do not constitute extreme and outrageous conduct); *Tracy v. New Milford Pub. Sch.*,

101 Conn. App. 560, 567-68 (2007) (allegations of defendant's harassment, intimidation,

defamation, and discipline of plaintiff—without conducting a proper investigation—do not rise

to the level of extreme and outrageous conduct); *Gillians v. Vivanco–Small,* 128 Conn. App. 207,

213 (2011) (allegations that defendant co-workers conspired to create hostile work environment,

falsely accused plaintiff of racial and sexual bias, and gave plaintiff negative performance

evaluations were insufficient for claim of intentional infliction of emotional distress); *Dollard v. Bd. of Educ. of Town of Orange*, 63 Conn. App. 550, 552-53 (2001) (allegations that defendant engaged in a concerted plan to force plaintiff to resign "or to become so distraught that they would have a colorable basis for terminating her employment" by "hypercritically examining every small detail of her professional and personal conduct," transferring her to another school and then secretly hiring a replacement, and publicly admonishing her were insufficient for claim of intentional infliction of emotional distress). DNC's conduct does not rise to the level of atrocious, intolerable conduct exceeding all possible bounds of decency. Thus, the Court grants DNC summary judgment on this claim.

### G.  Negligence Claim

Lute alleges that DNC "inter alia, failed, refused or neglected to supervise, train, instruct, monitor, adequately screen, hire or otherwise direct its agents, officers or employees regarding the plaintiff; to protect the plaintiff from the negligent, reckless, intentional or tortious acts of its agents, officers or employees; and by and through other acts and omissions failed, refused or neglected to fulfil[l] its duties to the plaintiff." (Compl. ¶¶ 41-42.) As noted above, this claim is limited to actions occurring during the termination process. There is no evidence to support the notion that DNC committed tortious acts in the termination process.[14] By the time DNC terminated Lute's employment on February 17, 2011, he had not been at work for about 11 weeks (since he was turned away by security when he arrived for work on November 30, 2010). He was informed of the termination by letter dated February 18, 2011, which he received at his home. There is no evidence in the record to support a claim of negligent conduct in connection with the termination. Thus, the Court grants DNC summary judgment on this claim.

---

[14] Plaintiff offers no evidence of harm other than emotional harm arising from the employment relationship itself.

### H.  Title VII Claim

Lute fails to point to any evidence that he suffered discrimination on account of his race, color, sex, religion or national origin. 42 U.S.C. § 2000e-2. Therefore, this claim is dismissed.

### I.  Motion to Strike

DNC moves to strike Lute's opposition brief because it exceeds the page limit, was untimely, and the Local Rule does not permit the filing of an "objection." (Def.'s Mot. Strike [Dkt. # 101].) The Court will exercise its discretion to deny the motion because motions to strike are disfavored, *Azikiwe v. Nigeria Airways Ltd.*, No. CV-03-6387 FBCLP, 2006 WL 2224450, at *1 (E.D.N.Y. July 31, 2006).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES Defendant's motion to strike and GRANTS Defendant's motion for summary judgment. The Court GRANTS Plaintiff's motion, *nunc pro tunc,* for leave to file excess pages. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                March 30, 2015